# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| ROSEMARIE GULLY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:15-cv-04122-NKL |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) |

## ORDER

Pending before the Court is Defendant United States of America's motion to dismiss, Doc 22. For the reasons set forth below, Defendant's motion is granted.

## I. Background

On September 16, 2013, Plaintiff Rosemarie Gully's husband, David Gully, was operating a haul truck at Huntsville Quarry, a surface limestone mine owned and operated by Con-Agg of MO, LLC. While transporting a load of rock from the bottom of the quarry to the primary crusher at the top, Mr. Gully's truck traveled through a berm[1] on the left edge of the roadway and went over a high wall. The truck fell approximately 80 feet and flipped over before coming to rest. Mr. Gully was ejected from the truck and pronounced dead at the scene.

---

[1] "Berm means a pile or mound of material along an elevated roadway capable of moderating or limiting the force of a vehicle in order to impede the vehicle's passage over the bank of the roadway." 30 C.F.R. § 56.2.

Federal regulations mandate two annual inspections of surface level mines receiving active use. 30 U.S.C. § 813(a). Prior to the September 2013 accident two inspections occurred at the Huntsville Quarry. The first occurred on March 13, 2013. The second inspection occurred on August 6, 2013. Neither of the inspections found any violations related to the berms.

After the accident, investigators at the Mine Safety and Health Administration ("MSHA") reported to the scene to determine whether Con-Agg complied with MSHA standards. It issued a report concluding that the accident occurred due to Con-Agg's failure to install and maintain sufficient berms along the edge of the haul road at the Huntsville Quarry. Con-Agg was issued three citations following the investigation:

1. Citation No. 6566852 for Con-Agg's violation of 30 C.F.R. § 56.9101 due to an operator of a haulage truck failing to maintain control of equipment while in motion.
2. Citation No. 6566853 for Con-Agg's violation of 30 C.F.R. § 56.14131(a) due to an operator of a haulage truck failing to wear a seat belt.
3. Citation No. 6566854 for Con-Agg's violation of 30 C.F.R. § 56.9300(a) due to the berms or guardrails in the vicinity of the accident having openings greater than the extent necessary for roadway drainage.

[Doc. 23-5, p. 5]. The citation for the berm violation was later vacated by an administrative law judge, who concluded that the berm placement was adequate. [Doc. 46-1].

## II.    Discussion

Plaintiff brought this wrongful death action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). She contends that the Government had a duty to inspect and investigate the Huntsville Quarry to ensure a safe

2

and healthy work environment, which was violated when the inspectors failed to cite the mine for violating rules and regulations related to the berms prior to Mr. Gully's accident.

The FTCA waives the government's sovereign immunity for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). However, there are various exceptions to this waiver, including the discretionary function exception which bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Government argues that the discretionary function exception applies here and bars Plaintiff's action.

### A. Test for Applying Discretionary Function Exception

The Supreme Court has developed a two part test for determining whether the discretionary function exception applies to an FTCA claim.[2] First, the Court must determine whether the Government engaged in an act that was "discretionary in nature," that is, one which "'involv[ed] an element of judgment or choice.'" *U.S. v. Gaubert*, 499

---

[2] The Court notes that the Eighth Circuit has not decided whether the plaintiff or the government bears the burden of proof in relation to the discretionary function exception. *See Hart v. U.S.*, 630 F.3d 1085, 1089, n.3 (2011). Other circuits are split on the issue. *Id.* As the Government has demonstrated that the discretionary function exception applies in this case, the Court does not address the question of which party has the burden of proof.

3

U.S. 315, 322 (1991) (quoting *Berkovitz by Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988)). An action is not discretionary "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.*

If the Court determines that the conduct at issue was discretionary under step one, it must next determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23 (quotation omitted). Only decisions "grounded in social, economic, and political policy" fall within the scope of the exception. *Id.* "The point of the discretionary-function exception is to make sure that government agencies and employees are free to make the policy-related decisions that their jobs require, without fear that they or the government may be sued whenever someone thinks they have decided badly, and without the added cost to taxpayers that frequent lawsuits would bring." *Claude v. Smola*, 263 F.3d 858, 860 (8th Cir. 2001).

### B. Discretion Afforded to Mine Inspectors

The Court must first determine whether the mine inspectors had discretion in inspecting the mines. If the inspectors were required to undertake specific actions which were not taken, the discretionary function exception does not apply because the inspector had no discretion to violate these requirements. *Berkovitz*, 486 U.S. at 544. If, however, the inspectors were afforded discretion in their investigations which was utilized in relation to the contested conduct, the first prong of the discretionary function exception is satisfied. *Id.* at 544-45.

4

### 1. The Haul Road and Berms Were Inspected

As discussed above, 30 U.S.C. § 813(a) mandates that "[a]uthorized representatives of the Secretary or the Secretary of Health and Human Services . . . make inspections . . . of each surface coal or other mine in its entirety at least two other times a year." As this is a mandatory directive, any violation of the requirement would not fall under the discretionary function exception and would necessitate the Court retaining jurisdiction over this action.

Plaintiff contends that the reports submitted by the Government to show that the mines received two annual inspections in accordance with this requirement are insufficient because they do not show that the berms at issue were inspected. The evidence does not support this contention. The inspections reports appear to contain notes from standard bi-annual comprehensive inspections of the quarry. [Docs. 9-3, 9-4]. The first report notes that no violations were observed on the haul roads. [Doc. 9-3, p. 18]. While Plaintiff correctly observes that this note appears on the bottom of a page stating "Pit/Drill ledge" at the top, there is nothing to suggest that the haul roads were not inspected outside of the pit. Moreover, not all pages in the field notes contain headings or uniform organization. To conclude that the haul roads were not inspected based solely upon a haphazardly included heading at the top of this inspection page would be unreasonable. Plaintiff also notes that the second report indicates only that "Roadways" were inspected, but does not specify which roadways were inspected or how. [Doc. 9-4, p. 29]. Nothing in the record suggests that such specificity was required.

More importantly, Plaintiff has pointed to nothing else in the record to suggest that the berms on the haul road were not considered by the inspectors. Marvin Lichtenfels, Deputy Administrator for the Metal and Nonmetal program area of MSHA, specifically noted in his affidavit that "[a] review of the General Field Notes for the two inspections performed at Huntsville Quarry surface mine of March 13, 2013 and August 6-7, 2013 reveals that an MSHA inspector met this mandatory duty through a visual inspection of the berms and concluded that no violations were observed." [Doc. 9-1, p. 3]. This statement indicates that Mr. Lichtenfels, who is responsible for the management of the field offices administering these inspections, believes the inspections reports show that the inspections performed included inspections of the relevant haul road.

The Court allowed Plaintiff approximately six months to conduct discovery in this case regarding the applicability of the discretionary function exception; therefore, Plaintiff had ample opportunity to uncover evidence that the haul roads were not inspected if such evidence existed. In the absence of any persuasive evidence to suggest that the inspectors failed to inspect the haul roads despite conducting two inspections of the mine in 2013, the Court concludes based on the current record that this requirement was not violated, and that the MSHA inspectors did inspect the relevant haul road and its berms to at least some extent.[3]

---

[3] Even if the inspections were not conducted with sufficient care, the discretionary function exception protects conduct which abuses the conveyed discretion. Therefore, even if the inspection was so cursory that it amounted to an abuse of discretion, this negligence would not make the discretionary function exception inapplicable.

6

## 2. MSHA Policies Afforded Inspectors Discretion In How to Inspect the Berms

The Court must next determine whether the MSHA inspectors were afforded discretion in the means by which they inspected the berms. Plaintiff contends that MSHA has policies which require MSHA inspectors to use measuring instruments to determine whether berms comply with MSHA standards. The Government argues that no such policies exist, and that inspectors are permitted to use simple visual observation to inspect berms.

The Code of Federal Regulations sets out standards for metal and non-metal surface mines in Title 30, Part 56. The requirements for berms are set out at 30 C.F.R. § 56.9300:

> § 56.9300 Berms or guardrails.
> (a) Berms or guardrails shall be provided and maintained on the banks of roadways where a drop-off exists of sufficient grade or depth to cause a vehicle to overturn or endanger persons in equipment.
> (b) Berms or guardrails shall be at least mid-axel height of the largest self-propelled mobile equipment which usually travels the roadway.
> (c) Berms may have openings to the extent necessary for roadway drainage.
> . . .

While the regulations set out these standards, nothing in the regulations describe how compliance is to be monitored by the inspectors. Therefore, the Court turns to internal MSHA policies to determine how inspections are to be conducted.

The MSHA Haul Road Inspection Handbook, published in 1999, discusses the following steps for investigators to take in monitoring berms:

7

- Emphasize to mine operators that to serve their function, earthen berms need to be **at least** mid-axel height, of firm construction, and steep-sided on the roadway side.
- Encourage the use of larger berms, especially in areas where vehicles may have more speed and in areas where there may be a greater chance of a vehicle going out of control, such as around curves or on steep grades..
- Remind mine operators that, where only finer-grained material is used in berm construction, and efforts are not made to compact and shape the berms, larger berms should be used to compensate.
- Be alert to how well the berms are maintained, and whether erosion, or sloughing of the slope, has undercut or otherwise made a berm inadequate.
- Check that boulder berms are placed back from the edge of the drop-off.

[Doc. 23-2, p. 33 (emphasis in original)].

The Metal and Nonmetal General Procedures Handbook, published in April 2013, sets out more standards for MSHA inspector behavior. On page i the document states how it is to be interpreted:

> The description of responsibilities that follows set forth the steps that mine inspectors take when conducting mine inspections. When the text describes an action which the inspector "shall" do or specifies steps which the inspector "shall" perform in some sequence, then the inspector is to do so consistent with specific conditions at a mine. Any determination not to conduct such action is to be based on his or her sound discretion and that of his or her supervisor. When the action is one which "should" be followed, then the inspector who does them is engaging in best practices for such inspection and should do them consistent with specific conditions at the mine.

[Doc. 43-6, p. 2]. According to the handbook,

> MSHA inspectors . . . must be committed to protecting the safety and health of our nation's most previous resource – the miner. Inspectors should always rely on the best available information, in conjunction with their training and experience, to reach fact-based, impartial decisions in safety and health matters involving miners.

[Doc. 43-6, p. 8]. It also indicates that inspectors should have inspection equipment including a measuring tape and ruler, *Id.* at 14, and "shall document" measurements in citations for violations, *Id.* at 69. The Mine Act confirms that if an investigator believes that a rule or regulation has been violated, he is required to issue a citation to the mine operator. 30 U.S.C. § 814(a).

While these handbooks contain general guidance for MSHA inspectors in conducting inspections, nothing in them appears to dictate how haul roads and berms are to be observed and evaluated. Despite stating that inspectors should carry measuring equipment and are required to make and document measurements if berms appear to be in violation of MSHA standards, nothing in the handbooks suggests that an inspector is required to measure a berm in all circumstances. Given the requirement that measurements be recorded in the event of a perceived violation, it is clear that an inspector would need to carry measurement equipment even if not required to specifically measure each berm.

Plaintiff also provided an affidavit from James Gore, who worked as a mine inspector with MSHA from 2000 until 2011. [Doc. 43-7]. Mr. Gore states that he was trained to use a ruler to determine the height of berms and that "[a] mine inspector should get out of his vehicle and inspect the berm to determine its height and not perform just a visual inspection." *Id.* at 1. He also states that berms should not be spaced more than four feet across.

9

The United States has produced declarations from five individuals stating that inspectors are not required to physically measure the berms when inspecting mine sites. [Docs. 9-1, 46-2, 46-3, 46-4, 46-5, and 46-6].

Marvin Lichtenfels, Deputy Administrator for the Metal and Nonmental program area of MSHA since October 2011, stated that his review of the General Field Notes from the two inspections performed at the Huntsville Quarry revealed that the MSHA inspector met his mandatory duty to inspect through visual inspection of the berms. [Doc. 9-1, p. 3]. As no violation was observed, Mr. Lichtenfels stated that the inspector was not required to issue a citation or conduct more than a visual inspection of the berms. He noted that despite Mr. Gore's statement that he was trained to use a ruler to determine the height of the berms and that an inspector should get out of his vehicle to inspect the berm to determine its height through more than a visual inspection, MSHA has no mandatory training or policy requiring an inspector to use a ruler to determine the placement of berms. [Doc. 46-2]. He also noted that MSHA does not require that the spacing between berms be no more than four feet. *Id.*

Roger Montali, who has worked as a Mine Safety Training Instructor with MSHA since October 2007, teaches a Surface Haulage course which addresses proper haul road inspections and regulations and procedures for evaluating and inspecting berms. [Doc. 46-3]. He stated that based on MSHA regulations at 30 C.F.R. § 56.9300 and the MSHA Inspection Manual he instructs inspectors to visually inspect the berms at surface mines. The training does not mandate the use of a ruler in all cases. However, if the inspector believes a violation exists the inspectors are taught to take measurements before issuing

10

citations to properly determine if a violation exists and provide documentation. According to Mr. Montali, "inspectors must use their discretion, based on geology, ground control, mobile equipment traffic, and water drainage to assess whether the berms are spaced sufficiently close together to be safe and far enough apart to provide for water damage." *Id.*

Steve Thompson, who as worked as a Mine Inspector with the Metal and Nonmetal program area of MSHA since 2001, stated that he has inspected the berms at the Huntsville Quarry approximately 12 times over the course of his 15 years working as a mine inspector. [Doc. 46-4]. To prepare for his work as an inspector he attended twenty weeks of training at the National Mine Health and Safety Academy when he began his employment, and every two years since 2001 has attended MSHA's "Journeyman" training at the academy. Mr. Thompson stated that in accordance with this training and MSHA policy, he conducted visual inspections of the berms at the Huntsville Quarry and did not use a ruler to measure the berms prior to Mr. Gully's accident. Following the accident Mr. Thompson was called to the quarry as part of an investigative team to inspect the scene of the accident and at the conclusion of the investigation a citation was issued to the mine operator, finding that the spacing between the berms was greater than was necessary for roadway drainage. This citation was later vacated by an administrative law judge.[4] [*See* Doc. 46-1]. Prior to this citation Mr. Thompson had never issued a citation for the relevant berm at the Huntsville Quarry.

---

[4] The administrative law judge found that the testimony "that the berm was sufficient is also supported by MSHA's own literature concerning the use of boulders as a berm

11

Dale Coleman II has also worked as a Mine Inspector with the Metal and Nonmetal program area of MSHA since 2009. [Doc. 46-5]. He has received training similar to Mr. Thompson. Mr. Coleman states that he was taught in training that visual inspections of berms at a surface mine are sufficient unless violations are observed, in which cause he was taught to take measurements and record the measurements in the field notes. On March 13, 2013, Mr. Coleman inspected the Huntsville Quarry and observed no violations in relation to the berm at issue. He conducted visual inspections of the berms and did not use a ruler to measure them.

Finally, Lawrence Sherrill stated that he has worked as a Supervisory Mine Inspector with the Metal and Nonmetal program of MSHA since January 19, 2016. [Doc. 46-6]. Prior to his promotion he worked as an MSHA inspector from September 1997 to January 2016. Like Mr. Thompson and Mr. Coleman, he received initial and ongoing training regarding inspection protocols. Mr. Sherrill stated that he was taught that visual inspection of berms at surface mines is sufficient unless potential violations are observed. He inspected the Huntsville Quarry on August 6-7, 2013, and observed no violations in relation to the berms along the haul road. Therefore, he made no measurements with a ruler to determine the specific height and placement of the berms.

The declarations from Mr. Lichtenfels, Mr. Montali, Mr. Thompson, Mr. Coleman, and Mr. Sherrill all note consistent training provided by MSHA to inspectors. In their combined decades of experience and many hundreds of mine inspections, they all

---

stating that the purpose of the berm is not to serve as a physical barrier capable of stopping a vehicle." [Doc. 46-1, p. 6].

12

state that they do not and have not been trained to use a ruler to measure berms where a visual inspection reveals no violation.

These statements are consistent with what the Court has observed in the Code of Federal Regulations and MSHA Handbooks provided to mine inspectors, which lay out general objectives for berms and inspections, but do not appear to contain any specifications regarding how an inspector should approach or inspect berms. While standards for the berms are set out, no protocol appears to exist for how an inspector should evaluate compliance with those standards. In the absence of any evidence of a regulation, policy, or training standard which indicates that MSHA inspectors are required to follow a set process in inspecting berms or that they are required to use a ruler to inspect berms in every instance, the Court concludes that MSHA inspectors are afforded discretion in their inspections, and that discretion encompasses the ability to perform visual inspections of berms rather than specifically measuring berms with a ruler or other measuring device.

Notably, nothing in Mr. Gore's affidavit contradicts this interpretation of MSHA's policies or requirements. While Mr. Gore stated that he was trained to use a ruler to determine the height of berms, this training is entirely consistent with the policies suggested by the other five affiants, who all noted that measurements are required when recording violations. As these measurements are required when recording violations, inspectors clearly require training in how to accurately measure the height and placement of berms. Mr. Gore also stated that a mine inspector "should" get out of his vehicle and inspect the berm to determine its height and not perform just a visual inspection, but he

13

did not state that any policy required such action. While physically measuring the berm may amount to the best practice for inspections, absent any policy or training indicating that such measurements are expected or required, there is nothing to indicate that inspectors must be held to this heightened standard. In fact, The Metal and Nonmetal General Procedures Handbook specifically distinguishes between required actions which inspectors "shall" take absent conference with a supervisor, and best practices which "should" be followed. [*See* Doc. 43-6, p. 2]. As nothing other than Mr. Gore's subjective belief statement indicates that using a ruler to measure the berms in all situations is even a best practice, the Court cannot conclude that it is a requirement.

Moreover, the discretionary function exception bars all claims falling within the scope of the exception, even if "the discretion involved be abused." 28 U.S.C. § 2680(a). Nothing in the record indicates that a physical inspection of the berm was required. Even if the MSHA inspectors abused their discretion in neglecting to use a ruler to measure the berm or in concluding that there was no violation observed in relation to the berm, such an error would not moot the applicability of the discretionary function exception.

As nothing in the record indicates that MSHA inspectors are required to physically measure berms or do anything more than visually inspect berms for violations, the Court concludes that the first step of the discretionary function exception is satisfied.

### C. Policy Underlying Discretionary Action

Even though inspectors have discretion in undertaking their inspections of the berms, the discretionary function exception does not bar this lawsuit unless "that judgment is of the kind that the discretionary function exception was designed to shield."

14

*U.S. v. Gaubert*, 499 U.S. 315, 322-23 (1991) (quotation omitted). "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. However, "[w]hen established governmental policy, as expressed or impled by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. . . . The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 342-25.

Congress enacted the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, *et seq.* ("Mine Act"), in order to improve working conditions and practices in mines around the nation. It recognized that the primary responsibility for safety in the mines lies with the operators of the mines and the miners working in them, but sought to establish mandatory health and safety standards to promote these goals. 30 U.S.C. § 801(e), (g). The Act also sought to ensure "the future growth of the coal or other mining industry." 30 U.S.C. § 801(d), (f). In order to achieve these goals, the Act required the Secretary of Health and Human Services to "develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws." 30 U.S.C. § 813(a). Based on this directive, MSHA developed the policies set out above.

As the Mine Act conveyed upon the Secretary the power to develop the policies to regulate and oversee the mines within its jurisdiction, the discretionary function exception bars claims challenging the policies implemented to achieve this regulation. *See U.S. v. Varig Airlines*, 467 U.S. 797, 819 (1984). The policy choices made by the Secretary necessarily involved decisions allocating scarce resources, weighing mine safety and industry growth concerns, and accommodating for differing circumstances present at the mines within the agency's jurisdiction. The Eighth Circuit has recognized that the discretionary function exception exists for exactly this circumstance, to ensure that government agencies are free to make these policy-related decisions without fear of lawsuits challenging their policy choices. *See Claude v. Smola*, 263 F.3d 858, 860 (8th Cir. 2001). As the exception also protects acts taken by officials in the exercise of the discretion allowed by these policies, the investigations at issue here satisfy the second prong of the exception. *See Berkovitz*, 486 U.S. at 546 (describing how the discretionary function exception applies to the regulatory scheme governing release of vaccine lots).

The Court's conclusion that the Government's actions meet the second prong of the discretionary function test is consistent with Supreme Court cases addressing similar situations. For example, in *U.S. v. Varig Airlines*, 467 U.S. 797 (1984), the Supreme Court concluded that the discretionary function exception barred an action against the FAA alleging that the FAA was negligent in failing to inspect certain elements of aircraft design before certifying two planes. The Court concluded that this challenge implicated the agency's "spot-check" program, which was implemented by the Secretary of Transportation to carry out its "duty to promote safety in air transportation by

16

promulgating reasonable rules and regulations governing the inspection, servicing, and overhaul of civil aircraft." *Id.* at 815. The Court explained:

> When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding. Here, the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

*Id.* at 819-20.

Like the FAA in *Varig*, MSHA was compelled by the Mine Act to develop policies and regulations to supervise the safety procedures and the mines within its jurisdiction. In developing these policies, the Administration necessarily had to balance the Act's objectives against its own resources to develop the appropriate regulations. As discussed above, MSHA implemented a policy which affords investigators discretion in their mine inspections. This is the type of discretionary action is protected by the discretionary function exception.[5]  *See Gaubert*, 499 U.S. at 325, n. 7 (distinguishing

---

[5] Plaintiff contends that there is no rational support for the notion that inspecting a berm is a matter of political, social, or economic policy. This argument ignores the presumption established by the Supreme Court in *Gaubert* that discretionary actions taken in accordance with the policy conveying the discretion fall within the scope of the

17

between discretionary decisions which are susceptible to policy analysis and those which fall outside of the regulatory regime, such as negligently driving a vehicle).

Plaintiff argues that when the challenged governmental activity involves safety considerations, the rationale for the discretionary function exception falls away. However, the cases cited by the Plaintiff in support of this contention do not stand for the proposition that safety concerns always moot the applicability of the discretionary function exception. *Varig* clearly indicates that safety concerns are not enough to moot the discretionary function exception where the issue is the policy permitting the inspection which took place. *See Camozzi v. Roland/Miller*, 866 F.2d 287, 290 (8th Cir. 1989) ("Thus, *Varig* immunized from liability the adoption by FAA of the 'spot-check' program and the failure of individual inspectors to inspect particular aircraft, 'because they were within the range of choice accorded by federal policy and law and were the result of policy determinations.'"). The Court must always consider whether the decisions are susceptible to policy analysis. Plaintiff is clearly challenging the discretionary policy permitting visual inspections of berms. This challenge is different from the action challenged in *Duke v. Department of Agriculture*, 131 F.3d 1407 (10th Cir. 1997), which was not defended on the basis of any significant social or political policy, and *Camozzi v. Roland/Miller*, 866 F.2d 287 (8th Cir. 1989), wherein the

---

exception. *See Gaubert*, 499 U.S. at 342-25. Plaintiff has presented nothing to rebut this presumption, and the Court concludes consistent with the Supreme Court's analysis in *Varig* and *Berkovitz* that the actions taken by the inspectors fall within the scope of the second prong of the exception.

18

government specifically retained some responsibility for its employee's safety in a contract.

As the investigators acted consistent with the discretion provided them by the MSHA's policy which was developed to accommodate for a variety of social and economic concerns, the Government's actions in this case fall within the scope of the discretionary function exception and the case must be dismissed.[6]

## III. Conclusion

For the reasons set forth above, Defendant's motion dismiss, Doc. 22, is granted.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 18, 2016
Jefferson City, Missouri

---

[6] As the Court concludes that the case must be dismissed due to the applicability of the discretionary function exception, it does not consider whether state law would impose liability on private persons engaging in like conduct, which the Government contends also bars this suit.